Exhibit 'A' 1 of 6

IN THE

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

NO. 03-KA-0416

STATE OF LOUISIANA,
                                                Appellee

V.

RHONDA K. OLIVER,
                                        Appellant

APPEALFROM THE TWENTY FOURTH JUDICIAL DISTRICT COURT,
PARISH OF JEFFERSON, STATE OF LOUISIANA, NO. 01-0955,
DIVISION "P", MELVIN C. ZENO, JUDGE

**SUPPLEMENTAL BRIEF ON BEHALF OF APPELLANT**

RHONDA K. OLIVER No. 314600
L.C.I.W. POST OFFICE BOX 26
PISCES-I
SAINT GABRIEL, LA 70776

Exhibit 'A'

## JURISDICTION

This Honorable Court has appellate jurisdiction over this matter by virtue of Article V, Section 10 of the Louisiana Constitution.

## RULING COMPLAINED OF

The commitment issued in this case constitutes the ruling complained of and is appended to this supplemental brief.

## PROCEDURAL CONTEXT

On February 8, 2001 appellant, Rhonda K. Oliver was charged with theft of goods held for sale valued at between $100.00 and $500.00, a violation of La. R.S. 14:67.10. (R.p.11). At arraignment on March 26, 2001 appellant entered a plea of not guilty. (R.p.1). Trial before a jury of six was held on July 31, 2001 and resulted in a verdict of guilty as charged. (R.pp.5-6; 26; 221-223 August 22, 2001 the trial court sentenced appellant to two years imprisonment at hard labor. (R.pp.41; 229). On October 3, 2001 the trial court found appellant to be a fourth felony offender. (R. pp.10; 251). On October 10, 2001 appellant was resentenced as a fourth offender to twenty years at hard labor without benefit of probation, parole, or suspension of sentence, with credit for time served. (R.pp.49; 255).

She comes now before this court on original appeal.

## FACTUAL BASIS

Joseph Bernard stated that on February 8, 2001 he was working as a security officer at the Oakwood Mall Sears. (R.p.133). With the aid of a security camera he observed appellant leave the store with two "juicers" each in its own bag. (R.pp. 136-137). She then took the items to her car, took one of the juicers and put it in her car, tore the bag that juicer came in, and then returned to the store with the remaining juicer in a bag, and the torn bag. (R.pp.137-138). Once back in the store she picked up a third juicer and took it, the torn bag, and the juicer in the bag to a register. (R.pp. 138-139). She received a fresh bag from the cashier, put the third juicer in it, and left store with two juicers in separate bags. (R.pp.139-140). A fellow security guard spoke to the cashier by phone and then followed and apprehended appellant. (R.pp.140-141).

Ms. Rubystein Goins, the cashier, stated that appellant came to the store to return a George Forman Grill and a juicer. (R.p. 164). She had

Exhibit 'A'

3 of 6

a receipt for neither and so instead received a "gift card" that permits her
to purchase other items in the store. (R.pp.164-165). Suspicious, Goins
telephoned Bernard in security and told him to keep an eye on appellant.
(R.pp.166). Later, appellant returned with two juicers, one in a bag, stating
that one of the juicer's bags had torn and requesting another bag in replacement.
(R.pp.166-167). Appellant had a receipt showing that she had purchased the
two juicers at a different register in the store that same day. (R.p.167).
Goins gave her the bag and she left. (R.p.167). Moments later Goins received
a telephone call from Walter Dominique in security. (R.p.167). Goins stated
that the juicer's retail for $179.00. (R.p.169). Goins positively identified
appellant in open court. (R.p.172).

On cross, Goins was presented with a receipt proving purchase of the
George Forman Grill and juicer on February 8, 2001. (R.pp.176-177).

Walter Dominique stated that after being alerted to the suspicions of
Bernard, he began watching appellant on security camera and saw her leave
with two juicers, return with one, pick up a third, and then leave again.
(R.pp.186-187). He stopped appellant in the mens department and brought
her to the office. (R.p.94).

The defense rested without presenting any testimony. (R.p.218).

Assignment of Error No. 1

The trial court errored by allowing one of the items seized from the appellants car during the unlawful search to be admitted before the jury throughout her trial.

At the time of appellants arrest, in addition to the juicer that was in her car, there were also other items in her car that was not the subject of defendant's trial. However, the state wanted to present these other items to the jury as evidence. (T.Tr.pg.76 lines 2-7). An evidentiary hearing was then held to determine if the items seized from appellants car was done so by a lawful search. (T.Tr.pg.81 lines 4-5). As a result of this hearing the court ruled that the constitutionality of the search had not been established through the witness. (T.Tr.pg.90 lines 19-21). The court further stated that the evidence ( items seized from appellants car) will not be admitted before the jury, because the constitutionality of the search had not been established through Mr. Walter Dominique. Moreover, there were no more witnesses called after Mr. Walter Dominique so that the constitutionality of the search could be established. Further, amongst the items seized from appellant's car was one juicer which happened to be the subject of appellants trial, and also one of the items which was seized during the unlawful search and seizure. Despite this fact and the fact that the judge ruled that this evidence will not be admitted before the jury, even after the courts ruling the juicer that was seized from appellant's car still was admitted before the jury. (T.Tr.pg.92). In all actuality there is no question that two of the three juicers were paid for (T.Tr. pg.35, lines 15-20) however, when the appellant was stopped she had in her possession only two juicers and a receipt for two juicers. (T.Tr. pg 35 lines 15 20) The third juicer which was needed for the state to build their case was obtained from a search and seizure that the court through the witness could not establish the constitutionality thereof. Appellant's trial should have only revolved around the two juicers that she possessed at the time she was stopped by Walter Dominique. The juicer (T.Tr. pg.35 lines 5, & pg.92) related to as "third juicer" "other juicer"; and "juicer in the car"; should have never been allowed before the jury, because it was one of the items seized during the unlawful search. Moreover, the appellants trial should have only been about two juicers. However, the juicer that was seized from appellant's car was mentioned throughout the entire trial. Although the state alleged that one of the two juicers that was in appellants possession, was stolen the state knew in order for them to build a case they had to

4.

Exhibit 'A'

5 of 6

include the juicer that was seized from appellant's car in their arguments. The state could not just build their case around the two juicers the appellant had in her possession, because her receipt proved she purchased two juicers.

Inconclusion, if the appellant had six items in her car, one of them being the subject of her trial and the court ruled that five of those items which was not the subject could not be admitted before the jury, then the one item that was the subject should not have been allowed either. It does not make the one item any more admissible merely because it was the subject of appellant's trial.

### Assignment of Error No. 2

**Appellants conviction was obtained in violation of the equal protection clause of the Louisiana Constitution, Article 1§3.**

The theft for which appellant has received a twenty year sentence was of an item valued at $179.00. Under La.R.S.14:67 a theft in such an amount would be a misdemeanor punishable by imprisonment for not more than six months. That $179.00 theft which she was prosecuted under treated as a felony under La.R.S.14:67.10. Indeed, if appellant would have been convicted for taking the same item from a shopping cart of a customer in Sears parking lot or even from a non-merchant entrepreneur such as Al Copeland's Restaurant, the crime would have only been a misdemeanor.

Appellant's conviction and sentence should be vacated and the matter remanded back to the trial court.

Exhibit 'A'

### CONCLUSION

Appellant's conviction and sentence should be set aside and the case remanded for further proceedings in conformity with the law.

Respectfully submitted,

Rhonda K. Oliver
L.C.I.W. Post Office Box 26
Pisces-I
Saint Gabriel, LA 70776

### CERTIFICATE

I hereby certify that a copy of the above and foregoing has been served upon the State of Louisiana via United States mail on July 18, 2003.

Rhonda K. Oliver

6.

Exhibit 'B'

TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

NO. 01-0955                                      DIVISION " P "

STATE OF LOUISIANA

VERSUS

RHONDA K. OLIVER

FILED : 7·9·08

_____
DEPUTY CLERK

O R D E R

This matter comes before the court on defendant's **MOTION TO CORRECT
ILLEGAL SENTENCE, FILED NOVEMBER 8, 2007.**

Defendant again comes before the court to argue that she was illegally sentenced
and requests the retroactive application of La. R.S. 14:67(B)(2), which at the time of her
conviction was felony theft, but would now qualify as a misdemeanor and thus not
eligible to be enhanced as a habitual offender. There in no statute entitling defendant to
retroactive application.

*But there is Constitutional and Case law.*

This court denied a previous motion to correct an illegal sentence on August 16,
2006. The Fifth Circuit found no error in that action and denied relief on September 22,
2006. This court denied another motion to correct illegal sentence on November 27,
2006. On March 12, 2007, the Fifth Circuit explicitly held that "the application discloses
no error in the trial court's rulings of August 16, 2006 and December 12, 2006 on
relator's Motions to Correct an Illegal Sentence."

However, as the defendant points out in her motion, there does not appear to be
resolution on her supplemental appeal, filed pro se on July 18, 2003. In connection with
these proceedings, defendant may choose to exercise her rights in the appropriate court
where it appears her appeal is still pending.

Accordingly,

**IT IS ORDERED BY THE COURT** that defendant's motion be and the same is
hereby **DENIED**.

Gretna, Louisiana, this 9th day of July, 2008.

_____
J U D G E

PLEASE SERVE:

PRISONER: Oliver, Rhonda, DOC #314600, LCIW, P.O. Box 25, St. Gabriel, LA 70776

EN BANC ATTORNEY, 802 2nd St., Gretna, LA 70053

IMAGED JUL 1 0 2008

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE

_____
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

Exhibit `C`

STATE OF LOUISIANA

VERSUS

RHONDA K. OLIVER

NO. 03-KA-416 c/w
09-KH-710 and 09-KH-711

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 01-955, DIVISION "P"
HONORABLE MELVIN C. ZENO, JUDGE PRESIDING

DECEMBER 29, 2009

## CLARENCE E. MCMANUS
### JUDGE

Panel composed of Judges Edward A. Dufresne, Jr.,
Clarence E. McManus and Walter J. Rothschild

PAUL D. CONNICK, JR.
    DISTRICT ATTORNEY
    Twenty-Fourth Judicial District
    Parish of Jefferson
TERRY M. BOUDREAUX
ANDREA F. LONG
    ASSISTANT DISTRICT ATTORNEYS
    200 Derbigny Street
    Gretna, Louisiana 70053
    COUNSEL FOR PLAINTIFF/APPELLEE

BRUCE G. WHITTAKER
    Attorney at Law
    Louisiana Appellate Project
    P. O. Box 791984
    New Orleans, LA 70179-1984
    COUNSEL FOR DEFENDANT/APPELLANT

RHONDA K. OLIVER
IN PROPER PERSON
    L.C.I.W. Post Office box 26
    Pisces-I
    Saint Gabriel, Louisiana 70776
    DEFENDANT/APPELLANT

## CONVICTION AND SENTENCE AFFIRMED;
## APPLICATIONS FOR WRITS DENIED

Exhibit `D`

**Martiny (HB 101)**                                                                          **Act No. 143**

Existing law (R.S. 14:67) defines the crime of theft and provides for penalties based upon the following values of the goods misappropriated or taken when:

(1)     The misappropriation or taking amounts to a value of $500 or more.
(2)     The misappropriation or taking amounts to a value of $300 or more, but less than a value of $500.
(3)     The misappropriation or taking amounts to less than a value of $300.

Existing law provides for the crimes of theft of animals, crawfish, oil and gas equipment, goods, an alligator, unauthorized use of food stamps, unlawful acts regarding receipts and universal product code labels, refund or access device application fraud, access device fraud, and issuing worthless checks.  Also provides penalties for each of these offenses based on the value of the goods taken or misappropriated, but which values are inconsistent with the values provided for the crime of theft.

New law provides for penalties in each of these crimes based upon the following values of the goods misappropriated or taken when:

(1)     The misappropriation or taking amounts to a value of $500 or more.
(2)     The misappropriation or taking amounts to a value of $300 or more, but less than a value of $500.
(3)     The misappropriation or taking amounts to less than a value of $300.

Prior law (R.S. 14:143) provides for the preemption of local ordinances defining certain crimes and creates exceptions for theft of animals and theft of an alligator when the misappropriation or taking amounts to less than $100.

New law increases this amount from $100 to $300.

Prior law provides that an officer may issue a summons for a felony charge of theft or illegal possession of stolen things when the thing of value is $100 or more but less than $500, he may give a written summons instead of making an arrest under certain circumstances.

New law increases this amount from $100 to $300 and otherwise retains the provisions of present law.

Effective August 15, 2006.

(Amends R.S. 14:67.2(B)(2) and (3), 67.5(B)(2) and (3), 67.9(2) and (3), 67.10(B)(2) and (3), 67.13(B)(2) and (3), 68.2(C)(2) and (3), 68.7(B)(1)(b), 70.2(C)(3) and (4), 70.4(E)(2) and (3), 71(D) and (E), 143(C)(3) and (10), and C.Cr.P. Art. 211(A)(intro. para.))

Exhibit E

IN THE

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

COURT OF APPEAL,
FIFTH CIRCUIT

FILED APR 2 4 2003

*[signature]* CLERK

NO. 03-KA-0416

STATE OF LOUISIANA,

Appellee

V.

RHONDA K. OLIVER,

Appellant

**APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT,
PARISH OF JEFFERSON, STATE OF LOUISIANA, NO. 01-0955,
DIVISION "P", MELVIN C. ZENO, JUDGE**

**ORIGINAL BRIEF ON BEHALF OF APPELLANT**

BRUCE G. WHITTAKER No. 08339
Louisiana Appellate Project
3316 Canal Street
New Orleans, LA 70119
(504) 822-5220

Exhibit B

Exhibit 'F'

**COURT OF APPEAL;**
**FIFTH CIRCUIT**

**FILED** JUL - 7 2003

July 2, 2003

Rhonda K. Oliver #314600
L.C.I.W. Post Office Box 26
Pisces-I
Saint Gabriel, Louisiana 70776

Re:State of Louisiana v. Rhonda K.
Oliver, Case No. 03-KA-0416

Fifth Circuit Court of Appeal
101 Derbigny Street
Gretna, Louisiana 70054

Dear Clerk of Court,

On April 24, 2003 a brief in the above mentioned case was filed with your office.  This brief was prepared by Attorney Bruce G. Whittaker whom was assigned to my case by the Louisiana Appellate Project.

I would like to ask the court to please allow me to supplement this brief, and to also give me a return date as to when this supplement should be filed.

Your prompt attention in this matter is greatly appreciated.

Respectfully Submitted;

Rhonda K. Oliver
Rhonda K. Oliver

EXHIBIT A

Exhibit `G'

STATE OF LOUISIANA

NO. 03-KA-416

VERSUS

COURT OF APPEAL

RHONDA D. OLIVER

FIFTH CIRCUIT

STATE OF LOUISIANA

## <u>ORDER</u>

IT IS HEREBY ordered that appellant, Rhonda K. Oliver, will have until July 18, 2003, to file a supplemental brief in this matter.

Gretna, Louisiana this 8th day of July, 2003.

JUDGE CLARENCE E. McMANUS

A TRUE COPY
GRETNA

JUL 8 - 2003

DEPUTY
CLERK
COURT OF APPEAL, FIFTH CIRCUIT

Exhibit "H"



EDWARD A. DUFRESNE, JR.
CHIEF JUDGE

SOL GOTHARD
JAMES L. CANNELLA
THOMAS F. DALEY
MARION F. EDWARDS
SUSAN M. CHEHARDY
CLARENCE E. McMANUS
WALTER J. ROTHSCHILD

JUDGES

# Court of Appeal

## FIFTH CIRCUIT
### STATE OF LOUISIANA
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054

PETER J. FITZGERALD, JR.
CLERK OF COURT

GENEVIEVE L. VERRETTE
CHIEF DEPUTY CLERK

GLYN RAE WAGUESPACK
FIRST DEPUTY CLERK

JERROLD B. PETERSON
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

February 19, 2004

Ms. Rhonda K. Oliver, #314600
L.C.I. 3U, P.O. Box 26
Aquarius – F
Saint Gabriel, Louisiana  70776

RE    **State of Louisiana versus
Oliver, Appeal No. 03-KA-416**

Dear Ms. Oliver:

      This Court received your February 12, 2004 letter on February 17.  In response, the records maintained by the Clerk of Court show that our supplemental brief was filed on July 18, 2003 and thereafter distributed to the judges on the panel for your appeal.

Sincerely,

Jerrold B. Peterson
Director of Central Staff

/rpg

Exhibit I

| | |
|---|---|
| STATE OF LOUISIANA | NO. 03-KA-416 |
| VERSUS | FIFTH CIRCUIT |
| RHONDA K. OLIVER | COURT OF APPEAL |
| | STATE OF LOUISIANA |

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 01-0955, DIVISION "P"
HONORABLE MELVIN C. ZENO, JUDGE PRESIDING

SEPTEMBER 30, 2003

CLARENCE E. McMANUS
JUDGE

Panel composed of Judges Edward A. Dufresne, Jr.,
Clarence E. McManus and Walter J. Rothschild

Paul D. Connick, Jr.
District Attorney
Terry Boudreaux
Assistant District Attorney
      Courthouse Annex
      Fifth Floor
      Gretna, Louisiana 70053
Counsel for State

Bruce G. Whittaker
      3316 Canal Street
      New Orleans, Louisiana 70119
Counsel for appellant

Rhonda K. Oliver
L.C.I.W. Post Office Box 26
Pisces-I
Saint Gabriel, Louisiana 70776
Appellant



**AFFIRMED**

# FINAL

# TRUTH

By *John Corley*

## *By the time you receive this letter, I will be dead.*

—Opening line of the suicide letter addressed to
Louisiana Fifth Circuit Court of Appeals Judge Tom Daley,
May 20, 2007

*There is nothing more dangerous than justice in the hands of judges …*

—Pablo Picasso, Spanish painter

*"Dear Judges,*
*This is a terribly abrupt way to*
*end my relationship with you,*
*the Court and all the staff; but*
*this is how it was destined to*
*end, I suspect …"*

**T**he bizarre episode has all the intrigue of a cheap pocket novel: accusations and attitudes, lies and cover-ups, high-powered public officials and low-level losers, violent death and vehement denial. While not particularly surprising to anyone familiar with Louisiana's historical brand of shady politics, what essentially transpired may be the single most astounding case of deliberate malfeasance and denial of constitutional rights in the history of the state judiciary.

Shortly before lunch on Monday, May 21, 2007, Detective Richard Russ of the Gretna Police Department wheeled into the lot at 101 Derbigny Street, home of the Louisiana Court of Appeal for the Fifth Circuit, in response to a report of a shooting on the premises. With two EMTs in tow, Russ was escorted to the office of the Central Staff Director, #124, on the first floor above the parking garage. There, he found the director, 55-year-old Jerrold Peterson, slumped in his chair behind his desk facing the west wall, a gun in his hand in his lap and a pool of blood rimmed with splatter on the carpet beneath him. A shell casing lay randomly on the window sill next to the desk. Peterson, an ugly hole in his right temple, was clearly deceased.

Officer Eric Stahl retrieved the Beretta 92F from the dead man's hand. It was cocked, one 9mm Hydra-Shok cartridge in the chamber and five in the 10-round magazine. There was blowback blood on the frame and slide. Exactly when Peterson brought the weapon to the workplace was anybody's guess, since courthouse employees, who had 24-hour access to the building, were not subjected to any type of security check. At the moment, *when* was not a priority issue.

Soon the room was filled with law enforcement officials and the usual retinue of investigators and forensic and medical personnel, and Russ set about the task of interviewing wit-

Exhibit 'J'

nesses. What kind of man was Peterson? Did anyone notice any unusual behavior recently? Why would he kill himself and right here in the halls of justice? Mary Ann Price, 47, the Business Services Manager, said the director was a private man who did not discuss personal matters, but yes, it was peculiar for him to lock himself in his office that morning—he almost always had someone in there, talking, and the door stayed open as a matter of routine. Otherwise, she noticed nothing out of the ordinary. Nor did she give it a second thought when Peterson asked her about survivor benefits for his family on the morning he evidently planned to commit suicide by nine millimeter.

Price told Russ she had been sent to Peterson's office that morning by Edward Dufresne, the Fifth Circuit's chief judge, with instructions to have Peterson come to Dufresne's office. She could hear

son claimed he suffered from depression over his brother's suicide in the summer of 2006, his daughter's accidental death several years ago, and ongoing marital discord.

Russ noted in his report that Dufresne appeared "evasive" about the nature of Peterson's staff problems. The judge finally disclosed that the Saturday meeting concerned the staff director's alleged inappropriate behavior with a subordinate through an e-mail. He "hinted" that termination or forced retirement "may" have been "mentioned" in this meeting. Peterson may have felt his job was endangered afterward, Dufresne said, although the judge had told him they would discuss the matter further the following Monday—which was in fact the purpose behind his sending Mary Ann Price to fetch Peterson in the minutes preceding the director's suicide.

> ## "The courthouse did not shut down, even with the blood of one of its own still wet on the carpet. It was a hell of a way to start the week."

the director muttering inside when she knocked, but the door was locked and it was apparent Peterson was not inclined to open it. This she reported to Dufresne, who instructed her to have 67-year-old security chief Joe Simon unlock the door and escort Peterson to the judge's office.

Price and Simon returned to Peterson's office, but as soon as Simon slipped his key into the lock a shot rang out from inside. The pair hurriedly summoned Dufresne, who came down from the second floor and with Simon at his shoulder opened Peterson's door. They peeked inside and then closed the door. The judge knew that if things were messy now, what was coming could very well bury the court under a load of steaming stinking scandal.

The courthouse did not shut down, even with the blood of one of its own still wet on the carpet. It was a hell of a way to start the week.

Edward Dufresne verified Price's chronology and told Detective Russ that he and the six other judges had met with Peterson on Saturday, two days prior, concerning some problems he was having with some of his staff. At that meeting, Peter-

Peterson's wife and son told Russ that he had suffered depression for many years and had been seeing a psychotherapist weekly since Hurricane Katrina in 2005. But there was no unusual behavior recently, they claimed, certainly nothing that would indicate what Peterson was planning. Neither had they seen Peterson with a gun, nor was there any marital or financial problems that they knew of.

The subordinate Dufresne had mentioned was Carolyn Treuting, 48, who admitted only that she and Peterson had been good friends for 25 years. She told police that she had last spoken with him the previous Saturday, but she said nothing about meeting with the judges. What she did know was that he was unhappy in his marriage and looking for a way out, and this should have been no secret to his wife.

Treuting did not consider Peterson suicidal. He was trying to obtain a newly-created position at the courthouse—Peterson lived for his job, Treuting said—but an unnamed person may have been using her and Peterson's relationship as leverage to

Exhibit 'J' 3 of 8

obtain the same position. As far as firearms went, Treuting said Peterson hated them and did not like the fact that she owned a gun.

Thirty-eight-year-old Tina Espenan was Jerrold Peterson's secretary. Russ tried to reach her by phone to set up an interview, but it was Tuesday morning before she finally took his call. Espenan agreed to meet Russ on the courthouse steps, but when he arrived she was nowhere in sight. He went inside to look for her and found Simon, who, according to the investigative report, advised the detective that Judge Dufresne said Espenan was hysterical, and the judge felt he could answer any questions Russ might have for the distraught woman. When the two men met again, Russ told Dufresne that an interview with the victim's secretary was inevitable he could wait until Espenan settled down. Dufresne suggested that he sit in on Russ' meeting with Espenan, but the detective refused. Interviews with witnesses would be conducted in private.

Peterson had written a suicide note in longhand on unlined paper. In fact, he wrote more than one, but the evidence was not immediately given to police. Why? Russ asked. The judge said he found the note—actually, a seven-page letter—in his mailbox the day of the suicide and read it while the police were at the scene. Dufresne kept quiet about it, he said, because it was addressed to him and his colleagues at the court and he thought it appropriate that he read it to them before turning it over to the investigators. Dufresne, who claimed he did not consider the letter a suicide note, read it at the usual Monday afternoon meeting and then delivered it to the Gretna Police Department's chief deputy, Charles Whitmer, who placed it in the case file.

Russ later interviewed Tina Espenan, who had regained her composure sufficiently to answer the detective's questions. Yes, it was unusual for Peterson to close and lock his door, she said, but she noticed no other curious behavior the morning of his death. She said she found a stack of paperwork on her desk when she came in around 10 a.m., including an envelope addressed to all the judges with a sticky note attached directing the envelope to Judge Dufresne. Espenan said she dropped the envelope in Dufresne's mailbox. After the shooting, she suspected a suicide note might be in the envelope and told Dufresne about

it. She did not know for sure, though, what was in the envelope.

Espenan said that Mary Ann Price had entered Peterson's office that Monday morning, and looked "somewhat disturbed" when she left.

Russ noted in his report that Peterson's suicide letter referred to his depression and also "questionable practices" by the Fifth Circuit judges. The detective then wrote his recommendation that the case be closed.

The *Times-Picayune* in New Orleans ran a story about Peterson's suicide on May 23, two days after the fact. The short article, confined to the Metro section, described Peterson as dedicated and well-liked.

Bryan Pedoux, the court's administrative general counsel, told the paper that, "As far as anyone knows it has nothing to do with anything here at the court." That article was the end of media coverage about Peterson's suicide—not a problem for the Fifth Circuit judges who undoubtedly preferred that the scrutiny simply fade away.

Jerrold Peterson's lopsided dedication to the venerable institution of justice is evident in his final letters, the capitalizations and respect given despite the burden of guilt levied upon his colleagues. From the moment he came to work for the court it seems he was pegged to do its dirty work. As time progressed, the favors became heavier, more intrusive and, in Peterson's words, downright illegal. But he never refused, even when he was placed in "harm's way" by whatever assignment he was given. Peterson spelled it out for the judges and the world in that final letter:

> How many of you have called and asked me to 'handle' traffic tickets or to get someone out of jail without bond, or to clear up contempt charges pending against friends? How many of you have told your attorney friends to call me about 'procedural issues' on cases before the Court? Never once have I declined to help someone you sent to me or refused to solve some problem you had.
>
> Above and beyond my regular duties and the extracurricular tasks you gave me, I have ably represented your interests at the Legislature for almost 10 years. Capital outlay, fee fund legislation, judges' pay raises—I've done it all. And, since Judges cannot engage

Exhibit 'J'

Exhibit J 4 of 8

*in politics, I did that. Under the appellation 'legislative coordinator,' I have lobbied for you for 10 years. Again, by shielding you from the prohibition against lobbying, I put myself in harm's way. The Court's lobbying efforts in Baton Rouge have become so flagrant, that the appellate courts now have a paid lobbyist. In fact, that lobbyist is a convicted felon. Each month, I send him a check for $2,084.00. This money comes from funds appropriated for the Court budget each year. In other words, taxpayer dollars are being used to pay a lobbyist for the courts. Again, I have shielded you from this illegal practice. As long as you got your pay raises, you were content to ignore the law.*

Though some might say the fraternity of judges and lawyers are prone to circle the wagons when trouble comes calling, ask an indigent defendant who has been dragged by the heels through the System and likely you will hear tales of attorney misrepresentation and judicial misconduct so outrageous as to be unbelievable. And those tales, mostly, *are* unbelievable. The System's swordsmen wield double-edged blades and anyone who believes the elected defenders of justice are always just is simply naive.

There are almost 39,000 inmates incarcerated in Louisiana's jails and prisons, and roughly 90 percent of them are unable to afford attorneys. They must combat their charges and convictions on their own—a tough climb for the astute, much more for someone with no previous legal experience. One of the more grievous injustices to these people, according to Peterson's last farewell, was the deliberate refusal of the Fifth Circuit to even look at a *pro se*—self-written and filed—writ seeking review of a trial court's ruling on an application for post conviction relief. A post conviction application is the document a prisoner files when his regular appeals have been exhausted, a sort of sweep-the-kitchen entreaty wherein he may complain of constitutional violations such as the ineffectiveness of his lawyer during the trial process or the discovery of favorable evidence withheld by prosecutors at trial. A person has a *right* to raise these complaints, a *right* to seek review by the appellate court and a *right* to be heard by that court. In fact, it is the Fifth Circuit's chief purpose under criminal law to rule on legitimately filed complaints by those who have been convicted of crimes. In order to render judgment, however, one must at least *look* at the application. Not so in the Fifth Circuit, Peterson claimed, which handles cases from Jefferson, St. Charles, St. James and St. John the Baptist parishes:

*For probably the past 10 years, not one criminal writ application filed by an inmate pro se has been reviewed by a Judge on the Court. I prepared the ruling on each of those writ applications, and they were signed by a Judge, without so much as a glance at the application. In fact, two of the judges on the writ panel never even knew the pro se application was filed, much less being aware of the application's contents. When the pro se application arrived in the mail, I opened it, prepared a ruling, and sent it to the Clerk's office for filing. When the application returned to Central Staff after filing, the ruling was already prepared. It was typed on the application and the application was signed by a Judge without so much as a glance. The total turnaround time was usually one or two days. It was obvious that these pro se criminal writ applications were not being reviewed because of the quick turnaround time. Moreover, although research memos are prepared for counseled criminal writ applications, a research memo*

Exhibit 'J'

for a pro se criminal writ application has not been prepared for probably 10 years. You were more than content to let me handle all pro se writs so you would not have to bother with them. Also, the large volume of pro se criminal writ applications inflated the Court's workload figures—even though no judge was involved in the handling of that writ (beyond signing a name).

One other attractive feature of the pro se writ handling system was the money it raised for the Clerk's Fee Fund. For each pro se writ application in a criminal case, the Court charged and received a fee of $300.00 from the parish where the criminal case was pending. The Clerk's Fee Fund swelled from the money earned on pro se criminal writ applications.

When this broken-spirited blather is peeled back there are found more than 2,500 *pro se* writ applications ignored by the Fifth Circuit between February 1994 and May 2007. The law says that such applications are to be reviewed by a three-judge panel, leaving no wiggle room for appeals courts to adopt contrary procedures. Nevertheless, the collective judiciary of the Fifth Circuit decided in February 1994 that *pro se* writ applications would be treated differently than lawyer-represented applications. The decision was recorded in the meeting minutes:

*Effective immediately, Judge Dufresne will handle all pro-se' writ applications and will not be included in the handling of regular writ applications. Special or unusual writ applications will be presented to a regular panel.*

This was a sweet deal for Edward Dufresne. After the eighth of February 1994, all incoming *pro se* writ applications were routed straight to Jerrold Peterson who, on unwritten instructions of the court, would review the applications himself rather than assign them to a judicial panel as the law required. From a list of 15 pre-prepared template rulings, Peterson would make a selection, scribble the ruling number, date and a set of identifying initials (such as "W.D." for "Writ Denied") on a sticky note he attached to the application, then have a secretary type the corresponding template ruling onto

a disposition sheet. Peterson would then take the sheet to Dufresne for signing. Whereas a legally reviewed writ application normally took at least a month to process, the Dufresne-Peterson method could be wrapped up in three to five days.

That's more than 2,500 writ applications that the judge had only to sign. The icing on the cake was that for each writ application Dufresne signed, the court received $300 from the local (taxpayers) government.

Standard procedure for counsel-represented applications filed into the Fifth Circuit included referral to Central Staff attorneys, law clerks, research attorneys and a panel comprised of three of the seven judges on the court. *Pro se* applications, however, received none of this lawful review; nobody qualified decided if the applications contained legitimate claims, nobody weighed constitutional violations against defendants' appellate rights, nobody seemed to care whether some poor prisoner who had spent more time in the prison law library gathering case law to support a single claim than most law clerks spend on entire petitions got a fair shake or not.

That is the issue at the core of this legal, ethical and constitutional debacle: the law was broken by those charged to uphold it and nobody cared. For 13 years Dufresne and Peterson, with the acquiescence of the court's other six members, got away with systematic constitutional violations against the

common and downtrodden—and in all likelihood would today still be getting away with it had not a pawn in the game become so disgusted with his life that he spilled his guts before putting a bullet in his brain. The formal disposition sheet with its authoritative signature, backed up with the typed names of fellow judges ostensibly in agreement with the chief judge, was merely a ruse designed to create the appearance of compliance with Louisiana Uniform Rules of Courts of Appeals, Rules 1-5, Louisiana statutory law, and the state and federal constitutions' guarantees of the right to judicial review and due process of law. Thirteen years.

According to documents filed with the Louisiana Supreme Court in June 2008 by New Orleans attorneys Martin E. Regan Jr. and Karla Baker, and Baton Rouge lawyer Edward Gonzales, representing two of the affected prisoners, between 1994 and 2000 Judges Dufresne, Cannella and Grisbaum were the only judges comprising the "three-judge panel." Between 2000 and 2006, the bogus "panel" was made up of Dufresne, Cannella and Edwards. Between 2006 and 2007, Dufresne, Edwards and Rothschild were the panel.

After Peterson's final criminal act left an ironic smoking gun in the detailed suicide letters, the unlawful review procedures at the Fifth Circuit came to an abrupt halt. Suddenly, *pro se* applicants were afforded the same consideration as writs represented by counsel. This did nothing, however, to ease the wounds to the thousands of indigent applicants over the past 13 years. If anything, it was salt to the sore.

And what did the State of Louisiana through its district attorneys have to say about this black-robed conundrum? Terry Boudreaux, an assistant district attorney for the 24th Judicial District in Jefferson Parish, whose office is next door to the Fifth Circuit building in Gretna, typifies the response: "[This] Defendant's writ should be denied because it seeks to impugn the integrity and independence of the courts ..." Boudreaux also claimed that prisoner complaints in this matter are negated because they are not constitutional issues, they do not demonstrate any prejudice suffered, and because the particular cases were decided long ago. Rational minds might find that the Fifth Circuit has impugned itself, and as for the rest, the mere lifting of an eyebrow lends too much credit to the argument.

When the Peterson story broke big last summer, hundreds of *pro se* appellants charged into the Supreme Court claiming the circuit court had violated their rights. Many demanded their claims be heard by other, untainted courts. Four months later the Fifth Circuit sought to stifle the damage by offering to re-review the appeals. "We are guided in this request by a desire to avoid imposing financial or other burdens on other judges in this state who might otherwise be called upon to consider these cases out of our court."

> "So the state Supreme Court, after receiving petitions from hundreds of applicants spurned by an idle and unprincipled Fifth Circuit, has stepped in. Kinda. The solution, the Supreme Court has decided, can safely be entrusted to the idle and unprincipled Fifth Circuit, which kindly volunteered to take a belated look at the appeals once Peterson had blown the whistle."
>
> —*Times-Picayune*, columnist James Gill

What was once a hidden, simple and lucrative process for disposing of the dispossessed had now become a nightmare of exposure. A few local reporters picked up on the story but it gained little momentum. One, *Times-Picayune* columnist James Gill, who earned his reputation by calling out corrupt public officials, did take note. Gill characterized the Fifth Circuit's dirty little secret "immoral" and "illegal." He did not mince words in his October 10, 2008, column. "Maybe the Judiciary Commission will be interested in the answer to those questions (other ethical and legal violations alleged in Peterson's suicide letters). But such ethical violations are small beer compared with the systemic denial of due process revealed by Peterson."

The game was up, the secret exposed and now someone had to clean up the mess. "So the state Supreme Court, after receiving petitions from hundreds of applicants spurned by an idle and unprincipled Fifth Circuit," Gill wrote, "has stepped in. Kinda. The solution, the Supreme Court has

Exhibit 'J'

decided, can safely be entrusted to the idle and unprincipled Fifth Circuit, which kindly volunteered to take a belated look at the appeals once Peterson had blown the whistle."

Assured by the Fifth Circuit's generosity, the Supreme Court remanded the contested cases to the scene of the crime. Surprisingly (even for Louisiana), only a single Justice, John Weimer, noticed that the high court's course steered into a headwind wreaking of the "appearance of impropriety." But the order stood, with Dufresne, Edwards and Rothschild precluded from reviewing the old appeals, and the new three-judge panels comprised from their colleagues who themselves knew of Peterson's accusations and the ramifications surely to follow should the truth become unmanageable.

Attorney Regan told *The Times-Picayune* in New Orleans that the Supreme Court's decision to order rehearings was one of the most monumental he had seen in his 32-year career, adding that "the potential for relief is tremendous."

Unimpressed by the resolution, Gill wrote that the arrangement "must strike the public as fishy, if only because the Fifth Circuit may not be all that keen to uncover miscarriages of justice within its own walls." Calling Dufresne the villain, Gill found it "hard to believe that not one of the other judges noticed they never saw a *pro se* appeal in 13 years." Commenting on the $300 copy plate, Gill wrote, "When you can read not a single word and still charge about $75,000, you have a good racket going."

Another early indicator of the Supreme Court's attitude toward this judicial quagmire may be the Halloween 2008 ruling in connection with two Angola inmates' consolidated application for rehearing filed by Regan and Gonzales. The petition suggested that *all* the Fifth Circuit judges be recused from reviewing the old appeals—after all, Peterson implicated the entire gang. It was promptly slapped with a denial that insisted it would be inappropriate to add "this number of cases to those dockets of other courts of appeal"

Exhibit "J"

"Moreover, we need not consider a police report which has been neither substantiated nor admitted into evidence in these or any other matters. While this may be the fodder of news reports and movies, it is not, in my view, proper evidence for judicial action."

and expending "approximately $200,000 of the public's money to hire retired judges and staff to perform this review." Let the Fifth Circuit judges—*not* the original suspects—review the appeals, and the Supreme Court will then, if asked, review *those* reviews and everything will be on the up and up. Writing for the Supreme Court, Justice Catherine D. Kimball felt compelled to explain:

> *This rehearing application, in my view, attempts to suggest that this court should base its decision not on evidence in any record, but rather on allegations in a suicide note which in itself suggests the depression of the writer who, if believed, had been fired by the very court which he accuses of misconduct. Moreover, we need not consider a police report which has been neither substantiated nor admitted into evidence in these or any other matters. While this may be the fodder of news reports and movies, it is not, in my view, proper evidence for judicial action.*

Though Louisiana jurisprudence recognizes the "dying declaration" as an exception to the "hearsay" exclusionary law and assumes an assertion uttered from the deathbed can be taken as true and virtually unassailable by an opposing litigant, Justice Kimball thought otherwise. Peterson's "dying declaration" was written and forwarded to all the Fifth Circuit judges, the Louisiana Judiciary Commission, *The Times-Picayune*, and a prominent New Orleans law firm. Undoubtedly, Kimball was not aware that at the time of his suicide, Peterson was still employed by the court. It is also remarkable that a police report is termed "unsubstantiated" by a Supreme Court Justice in a written ruling, when it could easily be substantiated by ordering a hearing for that express purpose, an order the Supreme Court was unwilling to issue.

Neither a front page bonanza nor a Hollywood script, the unprecedented, systemic denial of due process is a deadly tragedy and a travesty of justice that shames even the stone faces adorning the state capital. The Supreme Court's remarks resound with the certitude that the state's highest judicial authority is not immune to the quicksand of indifference and impropriety—rationally viewed.

There is still a long way to go before the Fifth Circuit completes its review of the old appeals. New motions were filed by Regan and Gonzales to recuse the appeals court, but they were denied as moot. A motion to clarify the procedure by which the appeals would be reviewed was denied with one word scrawled across the page. Nor does the Supreme Court seem willing to offer further guidance—with the exception of two justices (Chet Traylor has sided with Weimer in recent rulings) who apparently see a problem with the process. The attorneys, as well as hundreds of *pro se* petitioners, are now looking to the federal courts and the Justice Department for some help, but those avenues are too premature to produce results as state procedures are slowly becoming exhausted.

In the meantime, some 2,500 men and women who were unable to hire attorneys to represent them and whom Dufresne excluded from the appellate process will wait for that process to finally work. Probably not many of them are holding their breath. For their parts, Dufresne and other Fifth Circuit members declined to answer *Angolite* requests for their side of the story, preferring to allow their silence to speak for them.

Under these extraordinary circumstances, a fitting acknowledgment, composed by Angola inmate counsel substitutes, prefaces many a *pro se* application for post conviction relief that continues to gnaw at the appellate system:

> *As poor and tyrannized prisoners, we can only hope for justice on the other side of death; yet ... we will keep working for it on this side. Therefore, Jerrold Peterson, pro se litigants salute your selfless sacrifice. Know that your final truth is the right knowledge of reality, today, yesterday and tomorrow.*

∞

Exhibit 'J'

Exhibit `K`

# Court employee shot self at office

**APPEALS,** *from B-1*

including those filed by people lacking attorneys, or filed pro se, the attorneys said.

But Judge Edward Dufresne Jr. of Luling handled those requests, according to a document the attorneys filed with the state Supreme Court.

Attorneys Martin Regan and Karla Baker of New Orleans, and Ed Gonzales of Baton Rouge, want the Supreme Court to order a review of all appeals applications filed by people without attorneys during the 13-year period.

In a statement, the attorneys claim that "if in fact only one of those judges reviewed the applications, or delegated a court em-

ployee to review them, they were never properly reviewed. And any later proceedings in these cases, at both the state and federal level, were tainted."

Dufresne, elected from St. Charles Parish and now the 5th Circuit's chief judge, said he was unaware proceedings had been filed and referred questions to the court's attorney, Harry Rosenberg. Dufresne has served on the appeals court since 1981.

Dufresne said the state Judiciary Commission is looking into the matter. Its proceedings are confidential.

Rosenberg could not be reached for comment.

In their petition, the attorneys call the 1994 vote by the appellate judges to let Dufresne handle the appeals "an illegally adopted procedure." Under "unwritten court instructions," Peterson would review and pre-

pare writ denials, which then were signed by Dufresne.

"Unlike the applications submitted by defendants represented by counsel, the pro se writ applications were not presented to the central staff attorneys, law clerks, research attorneys or the other two judges whose names were typed on the disposition sheet," according to the petition.

"Therefore the applications were not reviewed by a legally mandated three-judge panel to ascertain whether the issues presented therein contained factual allegations or constitutional violations, which, if established, would entitle an applicant to relief."

Peterson, 55, of Metairie, shot himself in his office May 21,

2007. Two days before, Peterson wrote letters to 5th Circuit judges and the Judiciary Commission's general counsel, describing his depression and how he handled the pro se writ applications.

Peterson's letters said the court received $300 for each writ application despite having never reviewed the ones filed by people who did not have attorneys. "It seems ironic now that I earned more money for the court than any judge, and possibly all judges combined," Peterson wrote.

The attorneys' petition alleges that the 5th Circuit's handling of pro se writ applications ended the day Peterson died. The attorneys do not blame the practice on Peterson.

* * * * * * *

Paul Purpura can be reached at ppurpura@timespicayune.com or 504.826.3791.

---

# Inmates say judges ignored appeals

*Employee handled them, petition alleges*

**By Paul Purpura**
West Bank bureau

Attorneys for two inmates have asked the state Supreme Court to investigate their claims that for 13 years the 5th Circuit Court of Appeal in Gretna systematically — and illegally — ignored appeals filed by more than 2,000 people who did not have attorneys.

The appeals court judges approved the practice of allowing one judge to handle all pro se

writ applications between Feb. 8, 1994, and May 2007, according to a petition filed June 10 by attorneys for Kerry Myers and Ted Addison. The inmates say their appeals were improperly denied and that an appeals court employee, Jerrold Peterson, who committed suicide in his courthouse office last year, handled the denials instead of judges.

The 5th Circuit has eight judges who hear appeals from state district courts in Jefferson, St. Charles, St. John the Baptist and St. James parishes. By law, three-judge panels are supposed to review all writ applications.

*See* **APPEALS,** *B-2*

---

Addison, 33, of New Orleans, is serving a 20-year prison sentence for a 1999 armed robbery in Jefferson Parish. In connection with the claims, he sued the state in federal court in May and filed a complaint with the state Judiciary Commission, which investigates judicial misconduct, last year. He withdrew the lawsuit this month, but the commission is looking into the matter.

Myers, 51, is serving a life sentence in prison for second-degree murder of his wife, Janet Myers, in their Harvey home in 1984.

Exhibit `K`

Exhibit 'L'

Exhibit 'L'

10-26-08

# CLEANING UP THE MESS

## Who will review appeals ignored by 5th Circuit?



**ANDREA SHAW**
*Jefferson Report*

Not long ago, the spotlight was cast on the 24th Judicial Court in Gretna in the federal probe dubbed Operation Wrinkled Robe. It rooted out the corrupt bail bonds practices being employed at the Jefferson Parish Courthouse and jail and sent two judges and several others in law enforcement to prison for their crimes.

Yet the stain on the judiciary had barely faded when yet another scandal was uncovered.

This time, it's at the neighboring 5th Circuit Court of Appeal. One of its employees committed suicide in his office last year, and his tortured farewell notes revealed an illegal and immoral practice in which appellate judges systematically ignored and rejected hundreds of appeals by inmates who lacked attorneys.

Jarrold Peterson was 55 when he killed himself May 21, 2007.

Though he admitted that he had suffered from depression for years, Peterson's notes said that he could no longer live with himself after rejecting appeal after appeal and handing them over to Chief Judge Edward Dufresne Jr. for his signature. The law requires that pro se writ applications — appeals filed by people without attorneys — be reviewed by a three-judge panel. The illegal process began in 1994 after



FIFTH CIRCUIT COURT OF APPEAL

RUSTY COSTANZA / THE TIMES-PICAYUNE

In September the 5th Circuit Court of Appeal asked the state Supreme Court to allow it to review 299 petitions, including 281 from Jefferson Parish, that the Supreme Court has received challenging the appellate court's rejection.

a February meeting in which the judges agreed to let Dufresne handle pro se writs, according to documents filed with the Supreme Court.

"While my depression proved to be my undoing, each of you must ask yourselves what role you played in this?" Peterson wrote, obviously speaking of the judges.

In September, 17 months after Peterson's death, the 5th Circuit asked the state Supreme Court to allow it to review 299 petitions, including 281 from Jefferson Parish, that the Supreme Court has received since June challenging the appellate court's rejection. The 5th Circuit said five of its eight judges, who had no hand in the denial process of which Peterson wrote, would handle the appeals. The

court hears appeals from district courts in Jefferson, St. John the Baptist, St. Charles and St. James parishes.

Although the high court granted the appellate court's request to review the appeals, attorneys Martin Regan of New Orleans and Ed Gonzales of Baton Rouge are asking the state Supreme Court to reconsider. And hopefully, the high court will.

Regan and Gonzales cited three reasons why the 5th Circuit's involvement would taint the process, including the fact that all of the court's judges knew of the practice within hours of Peterson's death.

Given the circumstances, the attorneys wrote, the judges' ability to handle the appeals has been compromised.

In addition, the Gretna Police Department's investigation into Peterson's suicide painted an unflattering account as to how Dufresne handled the incident. In his police report, Detective Richard Russ said that the chief judge "appeared to be evasive with specific answers" to questions about Peterson's employment; that Dufresne withheld a suicide note for hours before turning it over to police; and that Dufresne suggested that he be present when detectives questioned Peterson's secretary.

Dufresne has acknowledged that the Judiciary Commission, which investigates judicial misconduct, is looking into the matter.

Supreme Court Associate Justice John Weimer disagreed with his colleagues on whether the 5th Circuit should be allowed to review the appeals, writing that ad hoc judges or another appellate district should handle the cases "to avoid any appearance of impropriety."

Now that attorneys have asked the high court to reconsider, Weimer's colleagues should heed his reasoning.

The reviews must be free of conflicts of interest, real or perceived. Otherwise, Peterson's writs will continue to make a skeptical public even more distrustful.

Wrote Peterson: "Who's (sic) integrity is really in question when you have conveniently ignored your duty to review pro se criminal writ applications so you can rectue your workload, present a false picture of the court's workload, and charge large sums for work you haven't done?"

* * * * * *

Andrea Shaw is West Bank bureau chief. She may be reached at ashaw@timespicayune.com or 504.826.3780.

Exhibit M



# Court of Appeal

## FIFTH CIRCUIT
## STATE OF LOUISIANA

101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054

EDWARD A. DUFRESNE, JR.
CHIEF JUDGE

SOL GOTHARD
JAMES L. CANNELLA
THOMAS F. DALEY
MARION F. EDWARDS
SUSAN M. CHEHARDY
CLARENCE E. McMANUS
WALTER J. ROTHSCHILD

JUDGES

PETER J. FITZGERALD, JR.
CLERK OF COURT

GENEVIEVE L. VERRETTE
CHIEF DEPUTY CLERK

GLYN RAE WAGUESPACK
FIRST DEPUTY CLERK

JERROLD B. PETERSON
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

March 2, 2004

Ms. Rhonda K. Oliver, #314600
L.C.I.W. Aquarius F Wing
P.O. Box 26
St. Gabriel, LA  70776

RE    **State of Louisiana versus**
      **Rhonda K. Oliver**
      **Appeal No. 03-KA-0416**

Dear Ms. Oliver:

    This Court received your February 23, 2004 letter on February 26.  In response, the decision issued on your appeal by this Court on September 30, 2003 affirmed your conviction and sentence.  We no longer have your record, which was returned to the district court on December 19, 2003.

                            Sincerely,

                            Jerrold B. Peterson
                            Director of Central Staff

/rpg

Exhibit M

Exhibit 'N'



EDWARD A. DUFRESNE, JR.
CHIEF JUDGE

SOL GOTHARD
JAMES L. CANNELLA
THOMAS F. DALEY
MARION F. EDWARDS
SUSAN M. CHEHARDY
CLARENCE E. McMANUS
WALTER J. ROTHSCHILD

JUDGES

# Court of Appeal

## FIFTH CIRCUIT
## STATE OF LOUISIANA

101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054

PETER J. FITZGERALD, JR
CLERK OF COURT

GENEVIEVE L. VERRETTE
CHIEF DEPUTY CLERK

GLYN RAE WAGUESPACK
FIRST DEPUTY CLERK

JERROLD B. PETERSON
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

August 30, 2006

Rhonda K. Oliver, #314600
L.C.I.W. – LEO-505
P.O. Box 26
Saint Gabriel, LA  70776-0026

RE:  **State of Louisiana v.**
**Rhonda K. Oliver**
**Appeal No. 03-KA-416**

Dear Ms. Oliver:

This Court received your August 18, 2006 letter and attachments on August 22, 2006. In response, the Fifth Circuit ruled on your appeal in No. 03-KA-416 on September 30, 2003; and the Louisiana Supreme Court thereafter denied your writ application on May 23, 2005.

We are therefore returning your letter and attachments.

Sincerely,

Jerrold B. Peterson
Director of Central Staff

/tce
Enclosures

Exhibit 'N'

Exhibit 'O' 1 of 6

# Application For Writs

A Motion To Correct Illegal Sentence / Motion Requesting Retroactive Application Of Recent Enactment Of LSA-R.S. 14:67.10(3) Was filed under docket no. 08-KH-639. This motion was granted and the 24th JDC July 9, 2008 ruling denying the same motion was vacated and set aside.

No. '08-KH-639

CONSOLIDATED WITH NO. 08-WR-901

In this matter twenty-four w of the twenty-four w applications that was filed between February 8, 1994 and May 21, 2007 and denied by the 5th Circuit Cou was reviewed as pursuant to the Supreme Court's October 10, 2008 ruling in State e; rel. Oliver v. State 08-1789, and denied again.

## COURT OF APPEAL, FIFTH CIRCUIT

### STATE OF LOUISIANA

AUG - 1 2008

*Mary S Legnon*

Deputy Clerk

**STATE OF LOUISIANA**
**VERSUS**
**RHONDA K. OLIVER**

IN RE  RHONDA K. OLIVER

APPLYING FOR  SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE MELVIN C. ZENO, DIVISION "P", NUMBER 01-955

**Attorneys for Relator:**

Rhonda K. Oliver #314600
L.C.I.W.
P. O. Box 26
Saint Gabriel, LA 70776-0026

**Attorneys for Respondent:**

Terry M. Boudreaux
Assistant District Attorney
Parish of Jefferson
200 Derbigny Street
Gretna, LA 70053
(504) 368-1020

## WRIT DENIED IN PART AND GRANTED IN PART

### See Disposition in Writ 08-WR-901

Gretna, Louisiana, this 18th day of March, 2009.

Exhibit 'O'

RHONDA K. OLIVER

VERSUS

STATE OF LOUISIANA

C/W

STATE OF LOUISIANA

VERSUS

RHONDA K. OLIVER

NO. 08-WR-901  C/W 08-KH-639

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

## WRIT DENIED IN PART AND GRANTED IN PART:

On October 10, 2008, the Louisiana Supreme Court transferred State ex rel. Oliver v. State, 08-1729 (La. 10/10/08), 08-WR-901, to this Court for consideration. State v. Cordero, 08-1717 (La. 10/3/08), 993 So.2d 203, rehearing denied, (La. 10/31/08). This writ application bears number 08-WR-901 in this Court. In addition, relator filed a writ application in this Court on August 1, 2008, 08-KH-639 which has been consolidated with 08-WR-901 for review. We have reviewed our records and found that relator had filed 24 pro se writ applications with this Court between February 8, 1994 and May 21, 2007. In order to fully comply with this Court's en banc resolution of September 9, 2008, we are reviewing all writ applications filed prior to 5/21/07.[1]

RELATOR'S APPEAL AND 08-KH-639:

On July 31, 2001, relator was found guilty by a jury of theft of goods valued between $100 and $500 and was sentenced as a habitual offender to 20 years imprisonment at hard labor without benefit of probation or suspension of sentence. Relator's conviction was affirmed by this Court on September 30, 2003. State v. Oliver, 03-416 (La. App. 5 Cir 9/30/03), 857 So.2d 1227. Relator sought review in

---

[1] We did not reconsider writ applications filed after May 21, 2007 as those were randomly allotted to three judge panels pursuant to our current procedure.

2

Exhibit 'O'

1. the Louisiana Supreme Court.  However, her writ application was filed untimely

2. and was treated as an application for post-conviction relief.  On May 20, 2005, the

3. Louisiana Supreme Court denied the writ, citing State ex rel. Melinie v. State.  93-

4. 1380 (La. 1/12/96), 665 So.2d 1172.  State ex rel. Oliver v. State, 04-2139 (La.

5. 5/20/05), 902 So.2d 1042.  *Review of Motion Filed In No. 08-KH-63*

6. In Writ No. 08-KH-639, relator Rhonda Oliver, who was represented by

7. counsel on appeal, seeks supervisory review from the July 9, 2008 order denying

8. her motion to correct an illegal sentence.  Ms. Oliver made two claims: (1) the

9. 2006 sentencing amendment to La. R.S. 14-67.10(2) should be applied

10. retroactively to her 2001 sentence, and (2) this court failed to consider her

11. supplemental pro se brief in State v. Oliver, 03-416 (La. App. 5 Cir. 9/30/03), 857

12. So.2d 1227.  In her writ application before this court, Ms. Oliver argues that she is

13. entitled to retroactive application of the sentencing statute because her sentence is

14. not yet final because this court failed to rule on the issues raised in her appellate

15. pro se supplemental brief.

16. The trial judge denied the retroactivity claim and further noted that this

17. court, on appeal, did not appear to resolve the issues raised in her supplemental pro

18. se brief.  He opined that Ms. Oliver might "choose to exercise her rights in the

19. appropriate court where it appears her appeal is still pending."

*July 9, 800 district court ruling in par*

20. It is clear from this Court's opinion in State v. Oliver 03-416 (La. App. 5

21. Cir. 9/30/03), 857 So.2d 1227 that this court did not consider Ms. Oliver's timely

22. filed pro se brief, although it granted her leave to file one.  Ms. Oliver's

23. supplemental pro se appellate brief raised these issues: (1) the trial court erred by

24. allowing one of the items seized from the appellant's car during the unlawful

25. search to be admitted before the jury, (2) appellant's conviction and sentence were

26. obtained in violation of the equal protection laws of the Louisiana Constitution,

3

1. The Louisiana Supreme Court "has indicated that the meaningful access to

2. the courts guaranteed by La. Const. art. I, Sections 2, 19, and 22 requires courts to

3. accept and consider post-verdict pro se filings from represented defendants." State

4. v. Melon, 95-2209 (La. 9/22/95), 660 So.2d 466, 466-67 (citations omitted).

5. There is a constitutional right to appeal in criminal cases when the defendant is to

6. be subjected to imprisonment or fine. State v. Counterman, 475 So.2d 336, 339

7. (La. 1985). La. Const. art. I, § 22 provides:

> 8. All courts shall be open, and every person shall have an adequate
> 9. remedy by due process of law and justice, administered without
> 10. denial, partiality, or unreasonable delay, for injury to him in his
> 11. person, property, reputation, or other rights.

12. Thus, a defendant who has timely filed a pro se supplemental appellate brief after

13. being granted leave to do so, has been denied her constitutional right to access to

14. the courts through full appellate review by the appellate court's failure to consider

15. her pro se supplemental appellate brief in her appeal. Mindful that the federal and

16. Louisiana State Constitutions prohibit the deprivation of a person's liberty without

17. due process of law, Louisiana's Code of Criminal Procedure provides for post-

18. conviction relief for persons who are in custody after sentence for conviction of an

19. offense if "the conviction was maintained in violation of the constitution of the

20. United States or the state of Louisiana." La.C.Cr.P. art. 930.3(1). Whenever the

21. fundamental fairness of access to full appellate review is affected, the defendant

22. should be allowed to seek redress of the error.

23. In State ex rel. Glover v. State, 93-2330 (La. 9/5/95), 660 So.2d 1189, 1197-

24. 98, abrogated on different grounds by State ex rel. Olivieri v. State, 00-0172 (La.

25. 2/21/01), 779 So.2d 735, 743-744, cert. denied, Olivieri v. Louisiana, 533 U.S.

26. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001) (jurisprudential interpretation of ex

27. post facto no longer viable), the Louisiana Supreme Court in addressing the time

28. bar to filing an application for post-conviction relief, explained (emphasis added,

29. footnotes omitted):

4

Review Of Motion Filed In No. 08-KH-639

1. We recognized in *Crier v. Whitecloud*, 496 So.2d 305, 310
2. (La.1986), that statutes of limitation are exclusively a legislative
3. prerogative whereby the legislature makes a legislative determination
4. that after a certain period of time an action can no longer be
5. maintained. The legislature's prerogative, however, only extends to
6. matters which do not violate constitutional rights. In this case, there is
7. no violation of petitioners' right of access to courts because Art. I, §
8. 22, a mandate to the judiciary to insure that all courts are open so that
9. every person shall have an adequate remedy by due process of law, is
10. not violated so long as a legislative measure, like Art. 930.8, does not
11. deprive petitioners of their right to due process. In addition, while Art.
12. 930.8 restricts the time limit during which some petitioners may apply
13. for post conviction relief, this article demonstrates the degree to which
14. persons convicted in Louisiana courts are afforded post conviction
15. access to courts. The post-conviction relief process in Louisiana
16. provides for an *additional level of review* for persons who have
17. already been tried (or who have pleaded guilty) who were convicted,
18. and who had the right to seek judicial review of that conviction.
19. Because Art. 930.8 only deprives certain applicants (those without
20. new facts, new law, and who have not been sentenced to death) of an
21. unlimited time period within which to file an application for post
22. conviction relief, it cannot be said that Art. 930.8 therefore denies
23. those whom it affects of their right of access to courts under Art. I, §
24. 22 of the Louisiana Constitution of 1974, in light of the *additional
25. level of review* the same statute provides for.

26. Thus, a review of Ms. Oliver's assignments of error raised in her pro se

27. supplemental appellate brief through a post-conviction level of review is

28. unsatisfactory, because the purpose of post-conviction review is to provide an

29. *additional level of review* to the defendant. We note that Ms. Oliver's retroactivity

30. claim is based on her view that her appeal is non-final. Thus, her retroactivity

31. claim is an issue that is related to her appeal. Since Ms. Oliver has not yet had her

32. original appellate review of her pro se assignments, we vacate and set aside the

33. July 9, 2008 ruling. We exercise our supervisory jurisdiction to grant a writ of

34. review. Because Ms. Oliver has alleged a valid claim that she was denied

35. appellate review, this case is remanded to the District Court for appointment of

36. counsel within 30 days of this writ disposition.[2] Within 30 days of the

37. appointment of counsel, the District Court is ordered to provide this court with the

38. original district court record in State v. Rhonda K. Oliver, 0/955, including the

[2] *See:* La.C.Cr.P. art. 930.7(A).

5

*Exhibit "O"* (handwritten)

1. minute entry and/or order appointing counsel. It is further ordered that the District

2. Court provide this Court with the appellate record and the envelope of exhibits that

3. were formerly lodged on appeal in State v. Rhonda K. Oliver, 03-KA-416 within

4. 30 days of the appointment of counsel. The Clerk of this Court is hereby ordered

5. this date to request the duplicate appellate record in 03-KA-416 from LSU. It is

6. further ordered that upon the lodging in this Court of the above records, the Clerk

7. of this Court docket the appeal according to appellate briefing procedure.

## REVIEW REQUIRED BY 08-WR-901

On September 11, 2001, relator filed writ application 01-KH-1055 with this

Court requesting review of the trial court's setting of post-conviction bail. This

Court denied relief finding no abuse of discretion in the trial court's setting the

amount of post-conviction bail. State v. Oliver, 01-1055 (La. App. 5 Cir.

9/18/01)(unpublished writ disposition). Relator did not seek review in the

Louisiana Supreme Court.

*Denied* (handwritten)

In this application, relator contended that the bail amount set by the trial

court was excessive. However, relator failed to make a showing that the amount

was excessive in this instance, in light of her prior criminal record. LSA-C.Cr.P.

art. 334(3). Based on our current analysis, we conclude there was no error in this

Court's previous ruling on writ application 01-KH-1055.

Subsequently, on September 26, 2001, relator filed a second application in

this Court, 01-KH-1105, again seeking review of the trial court's setting of bail.

Relator re-urged her claim that the amount of bail set by the trial court was

excessive. This Court denied relief finding no abuse of discretion by the trial court

in setting relator's bail. State v. Oliver, 01-1105 (La. App. 5 Cir.10/1/01)

(unpublished writ disposition). Relator did not seek review in the Louisiana

Supreme Court.

Exhibit 'P'

**1 of 2**

# TWENTY-FOURTH JUDICIAL DISTRICT COURT
## PARISH OF JEFFERSON
### STATE OF LOUISIANA

NO. 01-0955                                    **DIVISION "P"**

### STATE OF LOUISIANA

### VERSUS

### RHONDA K. OLIVER

FILED : 12.4.07

_____
DEPUTY CLERK

### O R D E R

This matter comes before the court on defendant's **SUPPLEMENT TO MOTION TO CORRECT ILLEGAL SENTENCE, STAMPED AS FILED NOVEMBER 26, 2006.**

The defendant is serving a twenty year sentence as a multiple felony offender. Following her adjudication as a multiple offender, the defendant has filed numerous challenges to her sentence with this court and the Fifth Circuit. Her conviction and sentence were upheld on direct appeal. *State v. Oliver*, 857 So.2d 1227, 03-416 (La.App. 5 Cir. 9/30/03).

The Fifth Circuit denied writs on March 12, 2007, noting that the application disclosed no error in the court's rulings of August 16, 2006 and December 12, 2006 on the motion to correct illegal sentence. The Supreme Court of Louisiana denied writs on September 14, 2007, as follows:

Denied. LSA-C.Cr.P. art. 930.8, *State ex rel. Glover v. State*, 93-2330 (La. 9/5/95), 660 So.2d 1189; *State v. Parker*, 98-0256, (La. 5/8/98), 711 So.2d 694; La.C.Cr.P. art. 930.3; *State ex rel. Melanie v. State*, 93-1380 (La. 1/12/96), 665 So.2d 1172.

The defendant now files a supplemental letter to point out case law to the court. She quotes from *State ex rel. Gregory Foucha v. Orleans Criminal District Court*, 642 So.2d 1274, 93-1001 (La. 9/2/94). The defendant argues that her conviction for cruelty to a juvenile was not final when her habitual offender adjudication was held.

A careful review of the facts is necessary to resolve this question. The defendant was charged in a multiple offender bill with being convicted of cruelty to a juvenile (R.S. 14: 93) in Orleans Parish case number 373-779. On October 3, 2001, the habitual offender hearing was held and the court found the defendant to be a multiple felony

**Exhibit P**

offender. Since that time, the defendant has raised many challenges to her twenty-year enhanced sentence.

In her present argument, the defendant specifically contends that her conviction for cruelty to a juvenile was not final at the time of her multiple offender hearing. However, this is not the case. In *State v. Oliver*, 00-1252, 790 So.2d 14 (La. 4/20/01), the Supreme Court of Louisiana denied writs in Orleans case number 373-779. Under LSA-C.Cr.P. art. 922, this conviction became final when the time to seek a rehearing, which is fourteen days, had expired. The defendant's conviction for cruelty to a juvenile was final months prior to her habitual offender hearing in Jefferson Parish.

Accordingly,

**IT IS ORDERED BY THE COURT** that defendant's motion be and the same is hereby **DENIED**.

Gretna, Louisiana, this _____ day of _____ 2007.

_____
**JUDGE**

**PLEASE SERVE:**

PRISONER: Rhonda Oliver, DOC #314600, LCIW, P.O. Box 25, St. Gabriel, LA 70776

EN BANC ATTORNEY, 200 Derbigny St., Gretna, LA 70053

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE.

_____
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

Exhibit `Q´

# SUPREME COURT OF LOUISIANA

400 Royal Street
New Orleans, LA 70130

June 11, 2008

To: Rhonda K. Oliver #314600                    Re: 00-KO-1252
    LCIW  Aquarius B
    P.O. Box 26
    St. Gabriel, LA  70776

       In reply to your letter of January 13, 2008, please be
       advised that:

( )   We have no record that anything was recently filed on
      your behalf in this Court.  Please contact your
      attorney, the clerk of the district court where you were
      convicted, or the _____ Circuit Court of Appeal.

( )   An application for writs was filed in this Court on
      _____ and is pending.

( X ) As requested, your writ application was filed in this
      Court on May 3, 2000 and denied on April 20, 2001.

( )   Your writ application is pending.  The Court will notify
      you when it has reached a decision in this matter.

( )   The following action has been taken on your case:
      _____.

                                   Sincerely,

                                   *Bl*
                                   Central Staff

Exhibit 'R'

---

**STATE OF LOUISIANA VS. <u>RHONDA</u> K.
<u>OLIVER</u>
SUPREME COURT OF LOUISIANA 2000-1252
(La. 04/20/01);**

**790 So. 2d 14; 2001 La. LEXIS 1474
No. 2000-KO-1252
April 20, 2001, Decided**

---

**Notice:**

DECISION WITHOUT PUBLISHED OPINION

**Editorial Information: Prior History**

IN RE: Oliver, Rhonda K.; - Defendant; Applying
for Writ of Certiorari and/or Review, Parish of
Orleans, Criminal District Court Div. G, Nos.
373-779; to the Court of Appeal, Fourth Circuit,
No. 99-KA-0425.
**Judges:** Catherine D. Kimball, Pascal F.
Calogero, Jr., Jeffrey P. Victory, Chet D. Traylor,
Jeannette Theriot Knoll, Philip C. Ciaccio.

**Opinion**

Denied.

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit S

# *Application For Writs*

## No. '07-KH-981

## COURT OF APPEAL, FIFTH CIRCUIT

## STATE OF LOUISIANA

DEC - 3 2007

*Mary S Legnon*

Deputy Clerk

**STATE OF LOUISIANA**
**VERSUS**
**RHONDA K. OLIVER**

IN RE RHONDA K. OLIVER

**APPLYING FOR**  SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE MELVIN C. ZENO, DIVISION "P", NUMBER 01-955

**Attorneys for Relator:**

Rhonda K. Oliver #314600
L.C.I.W.
Post Office Box 26
Saint Gabriel, LA  70776

**SEE ATTACHED:**

**Attorneys for Respondent:**

Terry M. Boudreaux
Assistant District Attorney
Parish of Jefferson
200 Derbigny Street
Gretna, LA 70053
(504) 368-1020

**WRIT DENIED:**

Gretna, Louisiana, this 14th day of *Jan*, 2008.

Exhibit 5

2 of 3

STATE OF LOUISIANA

VERSUS

RHONDA K. OLIVER

NO. 07-KH-981

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

**WRIT DENIED:**

Relator contends her sentence is illegal because she was incorrectly adjudicated a fourth felony offender. Relator contends that at the time of the commission of the theft, she had a writ application pending with the Supreme Court on one of her underlying convictions, cruelty to a juvenile, number 373-779. On March 1, 2000, the Fourth Circuit affirmed that conviction. An application for rehearing was not filed; however, a writ application to the Supreme Court was filed on May 3, 2000. The Supreme Court denied writs on April 20, 2001. The theft offense, which is the subject of this writ application, was committed on February 8, 2001.

In its response, the State concedes that a conviction must have become final before it can serve as the basis for the imposition of an enhanced sentenced, pursuant to Townley v. Dept. of Public Safety & Corr., 96-1940 (La. 11/1/96), 681 So.2d 951. However, the State contends the relator is not entitled to relief because she has failed to prove that her writ application to the Supreme Court regarding case no. 373-779 was filed timely.

Absent a showing by relator that she filed a timely appeal to the Supreme Court on case number 373-779, the review by the Supreme Court would not preclude the use of this case as a predicate offense for the purpose of adjudicating relator a forth felony offender. Accordingly, the trial court did not err in denying relator's motion.

Exhibit '5'

Gretna, Louisiana, this 14th day of Jan., 2008.

_____
T. D.
**JUDGE THOMAS F. DALEY**

_____
C E M
**JUDGE CLARENCE E. MCMANUS**

_____
GGG
**JUDGE GREG G. GUIDRY**

**A TRUE COPY**
**GRETNA**

JAN 14 2008

Mary Legnon DEPUTY CLERK
COURT OF APPEAL, FIFTH CIRCUIT

Exhibit 'J'

# The Supreme Court of the State of Louisiana

STATE EX REL. RHONDA OLIVER

VS.                                                 NO.  2008-KH-0511

STATE OF LOUISIANA

– – – – –

IN RE:  Oliver, Rhonda; – Plaintiff; Applying for Supervisory and/or
Remedial Writs, Parish of Jefferson,  24th Judicial District Court
Div. P, Nos. 01-955; to the Court of Appeal, Fifth Circuit, No.
07-KH-981

– – – – –

**November 14, 2008**

Denied.  La.C.Cr.P. art. 930.8; State ex rel. Glover v. State,
93-2330 (La. 9/5/95), 660 So.2d 1189; State v. Parker, 98-0256
(La. 5/8/98), 711 So.2d 694; La.C.Cr.P. art. 930.3; State ex
rel. Melinie v. State, 93-1380 (La. 1/12/96), 665 So.2d 1172.

                                JTK

                                PFC

                                CDK

                                BJJ

                                CDT

                                JLW

Supreme Court of Louisiana
November 14, 2008

*Katherine A. Fontana*
Deputy      Clerk of Court
            For the Court

Exhibit 'U'

**RHONDA K. OLIVER**
B/F, 05/13/72

SS.

**Parish of Jefferson**

PAUL D. CONNICK, JR., District Attorney of the Twenty-Fourth Judicial District Court of the State of Louisiana, who, in the name and by the authority of the said State, prosecutes in its behalf, through the undersigned assistant district attorney, comes into the Twenty-Fourth Judicial Court of the State of Louisiana, in and for the PARISH OF JEFFERSON and gives the said Court here to understand and be informed that one

### RHONDA K. OLIVER

was duly charged in a Bill of Information filed on the 22ND day of FEBRUARY, 2001 by DOMINICK TAMBURO, Assistant District Attorney for the Parish of Jefferson, under number 01-0955 of the docket of Division "P" of the Twenty Fourth Judicial District Court of the State of Louisiana, in and for the Parish of Jefferson, with the crime of violating Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-$500, a felony under the law of Louisiana, that afterwards, on the 31ST day of JULY, 2001, the accused WAS PLACED ON TRIAL ON A PETIT JURY; and, after due proceedings had, a verdict of Guilty of Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-500 was determined by the said jury against the defendant;

And now THOMAS S. BLOCK, Assistant District Attorney for the Parish of Jefferson, who in the name and by the authority of the said State, prosecutes, in this behalf in proper person, comes into the Twenty-Fourth Judicial District Court of the State of Louisiana, in and for the Parish of Jefferson, and gives the Court here to understand and be informed that RHONDA K. OLIVER was duly charged in case number 373-779 of the docket of SECTION G of the Criminal District Court of the State of Louisiana, in and for the Parish of Orleans, with the crime of violating Louisiana Revised Statute 14:93 CRUELTY TO A JUVENILE, a felony under the law of Louisiana; that afterwards the said RHONDA K. OLIVER was placed before a jury and was found guilty on the 7TH day of AUGUST, 1995, to a violation of Louisiana Revised Statute 14:93 CRUELTY TO A JUVENILE, and was sentenced by the Court, on the 13TH day of FEBRUARY, 1998, to serve 5 YEARS at hard labor in the custody of the Director of the Department of Corrections.

And now THOMAS S. BLOCK, Assistant District Attorney for the Parish of Jefferson, who in the name and by the authority of the said State, prosecutes, in this behalf in proper person, comes into the Twenty Fourth Judicial District Court of the State of Louisiana, in and for the Parish of Jefferson, and gives the Court here to understand and be informed that RHONDA K. OLIVER was duly charged in case number 364-447 of the docket of SECTION A of the Criminal District Court of the State of Louisiana, in and for the Parish of Orleans, with the crime of violating Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-500, a felony under the law of Louisiana; that afterwards the said RHONDA K. OLIVER PLEADED guilty on the 5TH day of JANUARY, 1994, to a violation of Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-500, and was sentenced by the Court, on the 5TH day of JANUARY, 1994, to serve 1 YEAR at hard labor in the custody of the Director of the Department of Corrections, SUSPENDED, 1 YEAR ACTIVE PROBATION.

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE

DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, LA.

the authority of the said State, prosecutes, in this behalf in proper person, comes into the Twenty Fourth Judicial District Court of the State of Louisiana, in and for the Parish of Jefferson, and gives the Court here to understand and be informed that RHONDA K. OLIVER was duly charged in case number 91-6336 of the docket of Division "M" of the Twenty Fourth Judicial District Court of the State of Louisiana, in and for the Parish of Jefferson, with the crime of violating Louisiana Revised Statute 14:67.10(A) THEFT OVER $500, a felony under the law of Louisiana; that afterwards the said RHONDA K. OLIVER PLEADED guilty on the 22ND day of JUNE, 1992, to a violation of Louisiana Revised Statute 14:67(A) THEFT OVER $500, and was sentenced by the Court, on the 22ND day of JUNE, 1992, to serve 1 YEAR at hard labor in the custody of the Director of the Department of Corrections, suspended, 2 years active probation.

That the said RHONDA K. OLIVER who WAS FOUND GUILTY as charged to a violation of Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-500, and was sentenced by the Court, on the 22nd day of AUGUST, 2001, is one and the same person who WAS FOUND guilty as to a violation of Louisiana Revised Statute 14:93 CRUELTY TO A JUVENILE on the 7TH day of AUGUST, 1995, is one and the same person who PLED guilty as to a violation of Louisiana Revised Statute 14:67.10(B) THEFT OF GOODS $100-500 on the 5TH day of JANUARY, 1994, is one and the same person who PLED guilty as to a violation of Louisiana Revised Statute 14:67(A) THEFT OVER $500 on the 22ND day of JUNE, 1992.

That the said RHONDA K. OLIVER should now be sentenced in accordance with Louisiana Revised Statute 15:529.1.

IMAGED

AUG 3 1 2001

_____
Assistant District Attorney

FILED: August 22 20 01

_____
Deputy Clerk

**INFORMATION FOR**

La. R.S. 15:529.1
**MULTIPLE OFFENDER BILL**

Exhibit "V"

JUDICIAL DIVISION
JEFFERSON PARISH
SHERIFF'S OFFICE

2006 AUG 17  AM 10: 45

Y:\scv\oliver, rhonda 01-0955, august 15, 2006.wpd

## TWENTY FOURTH JUDICIAL DISTRICT COURT
## PARISH OF JEFFERSON
## STATE OF LOUISIANA

NO. 01-955

STATE OF LOUISIANA
VERSUS
RHONDA OLIVER

DIVISION "P"

FILED: 8/16/06

DEPUTY CLERK

### ORDER

This matter comes before the Court on defendant's **MOTION TO CORRECT AN ILLEGAL SENTENCE UNDER LSA-C.CR.P. ART'S 881.5 AND 882 FILED JULY 26, 2006.**

The defendant claims that her multiple bill sentence is illegal. She claims that the State improperly used two prior felony convictions from Orleans Parish to enhance her sentence as a multiple offender in this case. Defendant maintains that the prior convictions were previously used to enhance her sentence as a double offender in case number 373-779 and; thus, cannot be used in the instant case.

Upon review, the defendant's interpretation of LA R.S. 15:529.1 is misplaced. The multiple bill statute does not prohibit the State's use of prior felony convictions even if they were previously used in another Multiple Bill of Information. Further, LA R.S. 15:529.1(D)(b) provides, in part:

> Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be rased to attack the sentence.

Accordingly,
**IT IS HEREBY ORDERED BY THIS COURT** that the defendant's motion be and the same is hereby **DENIED.**

Gretna, Louisiana this 16 day of August , 2006.

JUDGE

**PLEASE SERVE:**
**PRISONER: Rhonda Oliver, DOC# 314600,  LCIW, P.O. Box 26, St. Gabriel, LA  70776**
**En Banc Law Clerk, Main Courthouse Bldg., 200 Derbigny St., Gretna, LA 70053**

DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

# Exhibit W

# The Supreme Court of the State of Louisiana

STATE EX REL RHONDA K. OLIVER

VS.                                                    NO.   2006-KH-2632

STATE OF LOUISIANA


- - - - - -

IN RE:  Oliver, Rhonda K.; - Plaintiff; Applying for Supervisory
and/or Remedial Writs, Parish of Jefferson,  24th Judicial District
Court Div. P, Nos. 01-955; to the Court of Appeal, Fifth Circuit, No.
06-KH-694


- - - - - -

**September 14, 2007**


Denied.  La.C.Cr.P. art. 930.8; State ex rel. Glover v. State,
93-2330 (La. 9/5/95), 660 So.2d 1189; State v. Parker, 98-0256
(La. 5/8/98), 711 So.2d 694; La.C.Cr.P. art. 930.3; State ex
rel. Melinie v. State, 93-1380 (La. 1/12/96), 665 So.2d 1172.

                                        JTK

                                        PFC

                                        CDK

                                        CDT

                                        JLW


JOHNSON, J.,  would grant.


Supreme Court of Louisiana
September 14, 2007

**Deputy**      Clerk of Court
               For the Court

Exhibit `X`

The State of Louisiana } SS.     PARISH OF ORLEANS

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

Jeannette Flippen Ward

Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one _____ Rhonda Oliver

was duly charged in a Bill of Information filed on December 27, 1994, by Bruce Dearing, Assistant District Attorney for the Parish of Orleans, Criminal District Court Case Number 373-779 of the Docket of Section "G," with the crime of violating La.R.S. 14:93, relative to cruelty to a juvenile, a felony under the law of Louisiana, that afterward, on 7th day of August, 1995, the said accused was found guilty as charged.

And now the said Jeannette Flippen Ward, Assistant District Attorney for the Parish of Orleans, who prosecutes on behalf of the State of Louisiana; comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that heretofore, the said Rhonda Oliver, was duly charged in Case Number 364-447 of the docket of Section "A", with the crime of violating La.R.S. 14:67(B), relative to theft, that afterward, on the 5th day of January, 1994, the said accused pled guilty as charged.

The said Rhonda Oliver, who was sentenced as first above in case number 373-779G, is one and the same person who was sentenced in case number 364-447A.

That the said accused should now be sentenced in conformity with the provisions of R.S. 15:529.1 and that all these crimes herein are...

Clerk's Office _6/14_ 19_99_

A True Copy

_____ Deputy Clerk

Criminal District Court

Parish of Orleans

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

_____

Assistant District Attorney for the Parish of Orleans

1     CRIMINAL DISTRICT COURT

2      PARISH OF ORLEANS

3      STATE OF LOUISIANA

4

5  STATE OF LOUISIANA

6  VERSUS       # 373-779

             99-KA--0425

7  RHONDA K. OLIVER

8

9     Multiple bill proceedings taken in the

10 above-captioned matter before the HONORABLE JULIAN

11 A. PARKER, Judge presiding Section G, taken on the

12 1st of June, 1998.

13

14     APPEARANCES:

15      ADA JOHN JERRY GLAS

16       Representing the State of Louisiana

17      DONALD O. PINKSTON, ESQUIRE

18       Representing the defendant

19

20

21

22

23

24

25

26  REPORTED BY:

27  BRIAN P. SALZER

   CERTIFIED COURT REPORTER

28

29

30

31

32

        1

1                May I approach, Your Honor, with S-2

2        and S-3?

3                THE COURT:

4                    Yes, you may.

5            BY MR. GLAS:

6                Q.  I'm going to show you what we've marked

7        as S-2.  Can you please examine S-2 for me?

8                A.  (Witness viewing exhibit)  Yes, S-2 is

9        the arrest register that I brought over this

10       morning with the name, Ms. Rhonda K. Oliver, date

11       of birth 5-13 of '72.  The date of arrest is 6-5

12       of 1993.  Also, I have a set of fingerprints on

13       the back.

14               Q.  Did you have the occasion to compare the

15       fingerprints?  What type of fingerprints are on

16       the back of S-2, rolled or latent?

17               A.  They are rolled prints.

18               Q.  Okay.  And did you have occasion to

19       compare the rolled prints from S-1 to the rolled

20       prints of S-2?

21               A.  Yes, I have.

22               Q.  And do you have an opinion as to whether

23       those are the same?

24               A.  Yes, the prints in State's Exhibit 1 and

25       State's Exhibit 2 is one and the same person.

26               Q.  How were you able to determine that?

27               A.  By comparing the rolled prints from the

28       card that I took today and the prints that was

29       taken on the arrest register from 6-5 of '93.

30               Q.  And in terms of points of identification,

31       what are you looking for when you look to compare

32       prints?

4

Exhibit Z

1    TWENTY-FOURTH JUDICIAL DISTRICT COURT

2    PARISH OF JEFFERSON

3    STATE OF LOUISIANA

4

5

6    STATE OF LOUISIANA
                                        NOS. 01-0955
7    VERSUS
                                        DIVISION: "P"
8    RHONDA K. OLIVER

9

10

11

12   **MULTIPLE BILL HEARING**, taken in the above-entitled

13   and -numbered cause, before the **HON. MELVIN C. ZENO,**

14   Judge, presiding on Wednesday, October 3, 2001.

15

16

17

18   APPEARANCES:

19              REPRESENTING THE STATE OF LOUISIANA:

20              **THOMAS BLOCK, ESQ.,**
                     ASSISTANT DISTRICT ATTORNEY
21

22              REPRESENTING THE DEFENSE:

23              **A. BRUCE NETTERVILLE, ESQ.,**
                     ATTORNEY FOR RHONDA OLIVER
24

25

26

27   REPORTED BY:

28              **VINCENT P. BORRELLO, SR., CCR**
                OFFICIAL COURT REPORTER
29              IN AND FOR THE PARISH OF JEFFERSON
                STATE OF LOUISIANA
30

31

32

1

1    Q.    Okay.  And did you have occasion to observe or

2    compare the fingerprints on the back of the arrest

3    register under that charge with the fingerprints that

4    you took in court in State's Exhibit 1?

5    A.    Yes, sir, I did.

6    Q.    Okay.  And do you have an opinion as to whether

7    or not they were made by one and the same person?

8    A.    Yes.  Both sets of fingerprints were made by

9    the same person.

10   Q.    Let me show you now what I have marked as

11   State's Exhibit 3, in globo.  I ask you to take a

12   look at these documents.  See if you can identify

13   them?

14   A.    Okay.  These are court documents.  On the back

15   is stapled a copy of the arrest register which

16   contains a set of fingerprints on the back.

17   Q.    And the charges were for --

18   A.    Theft of goods valued at $116.50 and possession

19   of stolen property with the same value.

20   Q.    Did you have occasion to compare the

21   fingerprints on the back of the arrest register with

22   the fingerprints that you took in court today?

23   A.    Yes, sir, I did.

24   Q.    Do you have an opinion as to whether or not

25   they are made by one and the same person?

26   A.    All three sets of fingerprints were made by the

27   same person.

28   Q.    And, last, let me show you what I'm marking as

29   State's Exhibit 4, in globo.  I ask you to take a

30   look at those and I ask if you have seen these

31   documents before?

32   A.    These are court documents.  On the back is

Exhibit 'AA'

# The Supreme Court of the State of Louisiana

STATE EX REL. RHONDA K. OLIVER

NO. 2009-KH-1973

VS.

STATE OF LOUISIANA

– – – – –

IN RE: Oliver, Rhonda K.; - Plaintiff; Applying For Supervisory and/or Remedial Writs, Parish of Jefferson, 24th Judicial District Court Div. P, No. 01-0955; to the Court of Appeal, Fifth Circuit, No. 08-KH-639;

– – – – – –

August 18, 2010

Denied.

GGG

BJJ

JPV

JTK

JLW

MRC

Supreme Court of Louisiana
August 18,2010

*Rachel Adelman*

Deputy Clerk of Court
For the Court

Exhibit `BB' 1 of 11

```
 1      then walked outside and put them in her
 2      car.  She did come back with the bag and
 3      she did come back and show the receipt.
 4      Her intent and what she was always going
 5      to do was to take that juicer downstairs
 6      and hide it in a place because there were
 7      only a couple of juicers left.  They were
 8      on sale.  She was going to place it in
 9      some place in the store where it wouldn't
10      be seen.  She was going to leave and go
11      back and get some money and purchase the
12      last juicer.  That's what her intent was.
13      That's what she wanted to do.  She never
14      intended to leave the store and, in fact,
15      she did not leave the store.  The evidence
16      will show quite clearly that she came
17      right down the escalator.  The security
18      man came up and took her.  She totally
19      cooperated and walked out with him and
20      that's the last thing you're going to see
21      on the particular video.  It was never her
22      intent to steal anything at all and she
23      was not trying to steal it.  She merely
24      wanted to be able to purchase that juicer
25      on sale and that's what she was trying to
26      do.  She had just purchased two other
27      juicers with money.  She's a working lady.
28      She works.  She was never, never, never
29      going to steal that.  If you look at this
30      closely and look at all the facts, you
31      will see if you look at the video very
32      clearly that she never took anything.  She
```

The video does not show the defendant taking anything.

Exhibit `BB'

1   pulled the bottom of the bag out and put the

2   merchandize in the car, took the bag and folded it

3   and put it into the bag that she had set on the

4   ground and walked back to the store.

5   Q    Let's slow down for a second, all right, Mr.

6   Bernard?  First of all, is all of this captured on

7   video?

*All of this is not captured on video because it only show that the defendant put something in her car. They had no conduct the unconstitutional search to find out that it was a juicer.*

8   A    Yes, it is.

9   Q    And you observed this individual leave the

10  store.

11  A    Yes, I did.

12  Q    And she had how many bags?

13  A    Two bags.

14  Q    When she left the store, where did she go?

15  A    She went to her car.

16  Q    And did she open up a particular door of her

17  vehicle?

18  A    On the passenger side.

19  Q    Once she opened the passenger door, what did

20  she do with, I guess, the first bag?

21  A    The first bag she sat on the ground and she

22  opened the door and the second bag she had on the

23  front seat of the car on the passenger side.

24  Q    And you're still observing this on the video.

25  A    Yes.

26  Q    Once she placed the second bag on the passenger

27  seat, what did you see happen next? *The entire bag that contained one of the juicers was placed inside car. The juicer was taken out according to this* *defendant's testimony after the bag was placed in the car. They need to conduct t. Unconstitutional search to see exactly what it was the defendant p: in her car.*

*Defendant's Action*

28  A    It looked like she ripped the bottom of the bag

29  out and pushed the merchandize out of the bag onto

30  the seat.

31  Q    What happened next?

32  A    She took the bag, folded it, balled the bag up

21

*Exhibit 'BB'* *3 of 11*

```
 1   zooming it in and zooming it out?
 2   A    Yes, it is.
 3   Q    Okay.  By the time you observed her she already
 4   had the two juicers in the bags.
 5   A    Right.
 6   Q    Sir, where does that escalator go to?
 7   A    The escalator goes down to the first floor.
 8   Q    Is that the same escalator that we just saw?
 9   A    It's the same escalator, a different angle.
10   This is the first time she's leaving the store.
11   Q    So, she leaves the escalator and which way does
12   she go?
13   A    Okay.  She will be going toward the men's
14   department headed toward the hardware department
15   and exiting the store into the parking lot.
16   Q    Okay.  Can you point on that video which
17   direction the store exit into the parking lot is?
18   A    If you look here you can see the daylight from
19   outside.
20   Q    Thank you, sir.
21   A    That's an outside camera.
22   Q    That's her as she's leaving.
23   A    Yes.
24   Q    Why did you zoom down into those two bags?
25   A    I was looking to see what she was doing.  This
26   is where she ripped the bottom of the bag out.
27   Q    Okay.  And that was that jerking motion that
28   you just saw.
29   A    Yes, it is.
30   Q    Where is the juicer?
31   A    The juicers are still on the passenger side of
32   the car.
```

*It was daylight when defendant was apprehended and it was daylight when her car was searched. It was dark at the time the supervisor came and got me to sign a consent form.*

*photos were taken at night have after consent was sign*

```
1              Mr. Netterville's questions.
2    THE WITNESS:
3               Okay.
4               CROSS-EXAMINATION
5    BY MR. NETTERVILLE:
6    Q    Mr. Bernard, I'm Bruce Netterville.  I'm going
7    to ask you a couple of questions.  Okay?
8    A    Okay.
9    Q    Now, first of all, I think you said that you
10   saw Ms. Oliver visually.  She was walking down the
11   escalator going out the store.  You did not stop --
12   you didn't do anything or take any action because
13   she wasn't committing any crime.  Is that right?
14   A    Correct.
15   Q    So, you acknowledge then that she purchased two
16   juicers.  Isn't that correct?
17   A    I acknowledge that, yes, sir.
18   Q    Okay.  So, she had already purchased two
19   juicers.  Is that right?
20   A    Correct.
21   Q    Were you there when she was arrested?
22   A    Yes, I was.
23   Q    And I think you were showed a picture or a
24   photograph.  You said you saw the other juicer in
25   it.  Did you see the other juicer in the
26   photograph?
27   A    Yes, I did.
28   Q    That was the stolen one?
29   A    Yes, sir.
30   Q    How about the ones that she purchased?
31   A    The same box, the same type of merchandize,
32   same box.
```

*Mr. Bernard acKnowledge that the defendant purchased two juicers, which means the juicer in the car was needed to prove to the jury that one was stolen.*

*Other Juicer should not be mentioned.*

35

```
 1   A    Okay.
 2   Q    But as a result of what Mr. Bernard said to
 3   you, you began looking at the monitors.
 4   A    That's correct.
 5   Q    And were the store cameras video taping what
 6   was taking place?
 7   A    Yes, they were.
 8   Q    And did you have occasion to observe this
 9   female to do anything?
10   A    Yes, I did.
11   Q    What did she do?
12   A    She was in the appliance department and she was
13   holding two large bags of merchandize.  She left
14   appliances, went down the escalator and out the
15   exit near the parking lot and she went to her car
16   where she put one of the items in the car, took the
17   bag off the item, tore the bag off the item, and
18   she stuffed that bag inside the second bag she had
19   with the other merchandize in it and came back into
20   the store.  She went back up to the escalator to
21   the housewares department.  She picked up a juicer
22   from the sales floor and walked over to one of the
23   registers.  It looks like she waited for an
24   associate to come wait on her and then she decided
25   after a few minutes she went over to another
26   register where she had another associate help her
27   bag that juicer she had just taken off the floor.
28   Q    Okay.  And did you have occasion as a result of
29   what you have observed when the defendant left the
30   store with two bags and then came back in with one
31   juicer in a bag and the empty bag and pick up the
32   other juicer, as a result of what you observed, did
```

*Correct, the video shows that defendant put an item in her car but it is not clear from the video that the item was a juicer. This is why the police had to get in my car.*

70

Exhibit 'BB' 6 of 11

1   the office.

2   Q    Okay.  And what happened next?

3   A    At first she said, "Why?  Did I do something

4   wrong?  What did I do?"  I said, "Ma'am, we'll

5   discuss it in the office," and then she came to the

6   office with me.

7   Q    At that point what happened next, sir?

8   A    We went into the asset protection office and I

9   started to question her about her purchase and the

10  third juicer that was taken from the shelf.

11  Q    And what did she say with regard to that third

12  juicer?

13  A    She said she purchased it.

14  Q    And what did you do?

15  A    I then asked her, you know, confronted her with

16  the information I had gotten from Ms. Goins and

17  asked her, you know, "Show me a receipt for this

18  other item," and she couldn't.

19  MR. NETTERVILLE:

20          I'm going to object at this time.  I

21      would like to approach.

22  THE COURT:

23          Come on up.

24      (Whereupon discussion is held outside the

25      hearing of the jury panel)

26  MR. NETTERVILLE:

27          Judge, this is a custodial

28      interrogation of this lady.  I think at

29      this point they have to show affirmatively

30      that they gave all the constitutional

31      rights or at least an officer there read

32      her the rights.  I don't think that they

*Handwritten margin note beside lines 8-11: What third Juicer, defendant only had two.*

72

```
 1              You get the last word.
 2   MR. NETTERVILLE:
 3              I think it is a custodial
 4         interrogation.  I don't think they have
 5         established that it wasn't.  They took her
 6         into custody and brought her in the back
 7         and sealed her off from the public.  From
 8         everything we hear, she's not free to
 9         leave at that point.  They suspect her of
10         a crime and then they take a statement
11         from her.  The very nature of her being in
12         custody and them asking her questions, of
13         course, she's going to make some
14         statements, but I think they have to read
15         her her rights.  I think at that point
16         they have to read her her rights.
17   THE COURT:
18              Your objection is noted and overruled.
19   MR. NETTERVILLE:
20              We note our objection.  We're moving
21         for a mistrial on this issue.
22   THE COURT:
23              On the basis of what?
24   MR. NETTERVILLE:
25              It's highly prejudicial, Judge, and
26         they now have her in custody and the
27         statements.  There is no 768 Notice.  It's
28         not subject to a Motion to Suppress which
29         we filed and not given our opportunity.
30   THE COURT:
31              State, do you want to respond?
32   MR. BLOCK:
```

*[Handwritten annotation: It should have been a mistrial because the jury heard a lot of evidence regarding the knife that was illegally removed from defendant's car]*

74

```
 1            Does this testimony touch upon that
 2       juicer?
 3  MR. BLOCK:
 4            Yes, the police took it.
 5  THE COURT:
 6            Was it in the car?
 7  MR. BLOCK:
 8            Yes.
 9  MR. NETTERVILLE:
10            No.
11  MR. BLOCK:
12            Yes, it was.
13  MR. NETTERVILLE:
14            She brought it back.  She brought back
15       one of the paid juicers.
16  MR. BLOCK:
17            She brought two juicers back into the
18       store.
19  MR. NETTERVILLE:
20            She brought one juicer back in the car
21       because she brought a juicer in a bag.
22  MR. BLOCK:
23            One of the juicers was returned to the
24       store.  The other two were seized by JPSO.
25  THE COURT:
26            What's in the car?
27  MR. BLOCK:
28            Two juicers, two mix masters, a George
29       Foreman Grill, coincidentally the same
30       type that she's already returned and a big
31       comforter and it was all photographed and
32       she did not have any receipts for any of
```

*Still talking about What's in the car*

```
 1              they had already taken it and after these
 2              people had went in her car and taken these
 3              items.
 4    THE COURT:
 5                   Is that true?
 6    MR. BLOCK:
 7                   I don't know.  I know that she signed
 8              a consent.
 9    THE COURT:
10                   Do you have the consent?
11    MR. BLOCK:
12                   Let me see the -- I don't know.  You
13              know, I didn't ask him.  He was present
14              when she consented to have her car
15              searched and they got the property out of
16              the car.
17                   (Conclusion of discussion)
18    THE COURT:
19                   Deputy, take the jury out.
20              (Whereupon the jury exits the courtroom)
21    THE COURT:
22                   I'm going to have an evidentiary
23              hearing.
24    MR. BLOCK:
25                   Okay.  Well, that's fine, Judge.
26    THE COURT:
27                   Let the record reflect that the
28              objection by the defense with respects to
29              the testimony of this witness regarding a
30              search of the defendant's vehicle located
31              in the parking lot of Oakwood Mall, the
32              Court conducts an evidentiary hearing
```

1             To the best I can remember, sir.

2  THE COURT:

3             And all of that occurred prior to the

4        car door having been opened by anyone.

5  THE WITNESS:

6             Yes, sir.

7  THE COURT:

8             Would you have gone out to that car

9        but for the fact that the police were

10       going out to search it?

11  THE WITNESS:

12            Would I have gone out?

13  THE COURT:

14            Yes.

15  THE WITNESS:

16            No, sir.

17  THE COURT:

18            I'm not going to allow this evidence

19        before the jury. I do not find that the

20        constitutionality of the search has been

21        established through this witness. The

22        search was not one of his own. There's a

23        question as to when the consent was given

24        and under what circumstances and that must

25        be established by the police officer. I

26        have not ruled that it is inadmissible. I

27        am ruling that it is not by this witness.

28        I further find that his presence at the

29        car was provoked by the police who were on

30        the way out to search the vehicle. Had he

31        gone out on his own and viewed it through

32        that window, I would have allowed it, but

90

Exhibit 'BB'

11 of 11

1   Q    Is that the same bag that you received that

2   day?

3   A    Yes, sir, it is.

4   Q    And when you received it from Ms. Goins it was

5   ripped out at the bottom.

6   A    Yes, it was.

7   Q    Now, the juicer that was taken, the third

8   juicer, did this defendant have permission to take

9   that juicer?

10  A    No, she didn't.

11  Q    Did she have the consent of Sears to take that

12  without paying for it?

13  A    No, she didn't.

14  Q    And what happened to that third juicer, what

15  did you do with it?

16  A    We photographed it as evidence with the police

17  department and then we put it back on the floor for

18  sale.

19  Q    I show you what's previously been marked as

20  State's Exhibit 3 and shown to defense counsel.  Do

21  you recognize that photograph, sir?

22  A    Yes, sir.

23  Q    What is that a photograph of?

24  A    It's a photograph of the juicer along with our

25  sheet that we put on the photographs.

26  Q    And the other juicer, who took the other

27  juicer?

28  A    The police department.

29  MR. BLOCK:

30          Thank you.  Please answer Mr.

31      Netterville's questions, Mr. Dominique.

32          CROSS-EXAMINATION

US POSTAGE
$06.00

Rhonda K. Oliver #314600
L.C.I.W., P.O. Box 26, Gemini-2
Saint Gabriel, Louisiana 70776-0026

Legal Mail

Clerk's Office, U.S. District Court
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130